AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

FILED
SEP -4 2019
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

| United States of America | ) |
|---|---|
| v. | ) |
| Kerisimasi Reynolds, | ) Case No. |
| | ) |
| | ) 3 19 71446 |
| | ) |
| | ) |
| _Defendant(s)_ | |

JCS

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __August 31, 2017__ in the county of __San Francisco__ in the __Northern__ District of __California__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 42 U.S.C. § 1320a-7b(b) | Criminal penalties for acts involving Federal health care "Anti-Kickback Statute." |

~~UNDER SEAL~~

This criminal complaint is based on these facts:
Please see attached affidavit.

☑ Continued on the attached sheet.

Approved as to form: _/s/_
WILLIAM FRENTZEN
Assistant United States Attorney

_Complainant's signature_
Janette Spring, Special Agent - FBI
_Printed name and title_

Sworn to before me and signed in my presence.

Date: __9/3/19__

_Judge's signature_

City and state: __San Francisco, California__   Hon. Joseph C. Spero, U.S. Chief Magistrate Judge
_Printed name and title_

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Janette Spring, Special Agent with the Federal Bureau of Investigation ("FBI") being first duly sworn, hereby depose and state as follows:

## I. INTRODUCTION

### A. SYNOPSIS

1. I submit this affidavit in support of a criminal Complaint for Dr. Kerisimasi REYNOLDS ("REYNOLDS"), and Dr. April MANCUSO ("MANCUSO").

2. There is probable cause to believe REYNOLDS and MANCUSO engaged in a scheme to defraud Medicare by receiving kickback payments in exchange for the referral of home health and/or hospice patients in violation of and 42 U.S.C. § 1320a-7b(b), the anti-kickback statute.

3. As part of this investigation, the Agents have obtained information from the cooperation of an FBI confidential witness ("CW-1")[1] and evidence obtained by an FBI undercover employee ("UCE"):

4. An identified co-conspirator introduced REYNOLDS as an individual willing to accept kickback payments in exchange for the referral of patients. REYNOLDS later introduced his wife, MANCUSO, as a co-conspirator in furtherance of the scheme.

5. During the course of the investigation, UCE held in-person audio and video recorded conversations with REYNOLDS and MANCUSO, in 2017 and 2018, in which REYNOLDS and

---

[1] CW-1 has provided information and services to the FBI over approximately two years and has received no monetary compensation or other consideration from the FBI in exchange for the information and services. However, CW-1 was employed by a home health care agency ("HHA Alpha"), which served as a cooperating entity supporting the FBI's undercover operation. As a result of the undercover operation, patient numbers and/or revenue to CW-1 and CW-1's HHA may have increased. These potential increases to CW-1's HHA may have provided benefit to CW-1 by improving his/her standing with the employing HHA. A criminal background check of CW-1 revealed convictions for embezzlement, grand theft, and an arrest for false claim to citizenship. CW-1 is an undocumented immigrant who entered the United States illegally and by presenting false identifying documents to a CBP officer. The CW-1 later falsely denied having possessed false identifying documents when interviewed by immigration officers. Although CW-1 is a removable alien, removal has been deferred under the Convention Against Torture. The CW-1 may have an incentive to curry favor with federal law enforcement because of his immigration status. After the conclusion of this undercover operation, FBI Agents became aware that during the undercover operation but after HHA Alpha was no longer accepting patient referrals from targets of the investigation, CW-1 was believed to have tried to use his/her role as a source to threaten an individual – with whom he/she had a personal dispute – with a law enforcement investigation into the practices of this individual. To my knowledge, those threats were never carried out. CW-1 is not currently the subject of any pending criminal charges.

1

MANCUSO, receive kickback payments in exchange for the referral of home health and/or hospice patients.

### B.    BACKGROUND AND LEGAL FRAMEWORK AND INVESTIGATION

6.      Starting in the 1970s, Congress created, amended, and strengthened the "Anti-Kickback Act", currently United State Code, Title 42, Section 1320a-7b(b). The relevant language of the statute is listed below. In essence, the law criminalizes influencing referrals for federally funded health care through payments. The legislative history revealed Congress was deeply concerned the normalization of kickbacks in federally funded health care programs would lead to fraud and an undermining of the quality of patient services since "operators become more concerned with rebates than with care.[2]" FBI Agents began looking into kickbacks in the San Francisco Bay Area, specifically in the fields of home health and hospice. Their investigation arose from concerns of false billing, referrals without patient care in mind, that health care providers would have a willingness to expose their patients to unnecessary treatments and that certain home health agencies ("HHAs") would have a willingness to bill for, but not provide, necessary services. The preliminary investigation into kickbacks occurring in the Bay Area in the fields of home health and hospice revealed that the above concerns were indeed occurring. Some of the most egregious examples uncovered by the investigation included doctors who referred patients to hospice care in exchange for kickbacks while demanding a "longevity" bonus – meaning the doctor would financially benefit the longer a patient remained on hospice. Since hospice is generally meant for palliative care without curative intent, this system could encourage doctors to abandon curative options earlier with potentially life threatening outcomes.[3]

7.      An undercover operation was selected as the means of investigating kickbacks. From training and experience, the investigators understood that health care providers and HHAs shrouded their activities in secrecy. Typically, health care providers were given kickbacks in the form of cash payments made in closed door meetings between themselves and HHA representatives. Some used bogus medical

---

[2] "Kickbacks Among Medicaid Providers", Senate Report 95-320, 1977.
[3] In fact, throughout the course of the investigation, four of the targets, while negotiating kickback payment amounts, discussed similar "longevity" bonuses. UCE agreed to these bonuses or entertained further discussion to potentially identify any such referrals by proactively identifying at-risk patients. During the course of the investigation, no such longevity bonus referrals were made to the UCO.

2

directorship/consultant contracts to disguise kickbacks as payments for seemingly legitimate, but actually non-existent, services. Given the expected closed nature of the transactions and the relatively traceless nature of cash payments, traditional documentary and other overt investigative techniques were deemed to be ineffective. An undercover operation ("UCO") was considered as the most efficient and most successful means to gather direct evidence of the payments and the corrupt intent of the kickback payments.

8. Around July 2016, two employees of a known Bay Area home health agency ("HHA Alpha") made a complaint to Health and Human Services Office of Inspector General ("HHS-OIG") regarding payments of kickbacks to doctors by other HHAs in the Bay Area. One of the two agreed to serve as a cooperating witness ("CW-1"). CW-1 was paired with an undercover FBI agent ("UCE"), based in San Francisco, who would portray himself/herself as someone representing investors, intent on acquiring HHA Alpha and seeking to expand HHA Alpha's patient population through illegal kickbacks. UCE often communicated with targets in furtherance of the UCO while in San Francisco. The UCO sought to investigate predicated targets and to use predicated targets to refer UCE to other violators who the targets believed to be engaged in similar conduct.

9. In designing the UCO, investigators learned health care providers were weary of potential legal risks that caused them to be unwilling to accept kickbacks from an unknown undercover agent without an introduction from a known member of the industry. Further, the nature and size of the kickbacks were dependent on the types of HHA services required. For example, certain types of insurance and services were reimbursed at a higher rate, which in turn would lead to higher kickbacks. Many health care providers were also quite concerned with patient satisfaction, partially to avoid a disgruntled patient from questioning the corrupt HHA referral. Therefore, the ability to provide specific details about services, accepted insurance plans, and patient satisfaction was critical to both gaining the initial introductions and to allowing the UCO to expand. The involvement of a vetted HHA would facilitate entry of the UCO and allow kickback referrals to be diverted away from predicated HHA companies. Further, the care provided by the vetted HHA could be monitored and reviewed.

10.     In keeping with those goals, HHA Alpha effectively served as a cooperating entity through its management and its participation in the UCO. The FBI investigation was partly based upon analysis of so-called outlier data – data showing abnormal and potentially illegal conduct – among HHAs and doctors as well as through interviews. Based on examination of the data and interviews, HHA Alpha did not fall into the profile of a likely kickback offender. Checks of FBI databases did not reveal HHA Alpha as a prior or current subject of any investigations. Additionally, the FBI consulted with HHS-OIG and determined HHA Alpha was not a prior or current subject of any investigations. From the founding of HHA Alpha in 2009 until the initiation of the UCO, Medicare received two complaints[4], which were later deemed to be unsubstantiated. Additionally, HHA Alpha's owner was aware that CW-1 would be cooperating with an investigation and the patient paperwork and referrals to HHA Alpha during the UCO were required to be brought to the attention of the investigating agency. Patients referred to HHA Alpha by physicians and others receiving payment from FBI through the UCO, (1) were contacted by an employee of HHA Alpha to obtain their consent for treatment by HHA Alpha, (2) as a result of this consent and intake process, some patients ultimately did not receive treatment from HHA Alpha because they declined treatment, preferred an HHA of their own choosing, or medical evaluation determined treatment was inappropriate, (3) HHA Alpha was made aware of patients that were referred through the course of the UCO, and (4) FBI conducted interviews of all available patients referred to HHA Alpha and there were no serious allegations of failure in patient care.[5] During the course of the UCO, there was one complaint regarding patient care provided by HHA Alpha made by a recently hired, and then fired employee, but an investigation by the California Department of Public Health did not result in any negative finding against HHA Alpha. No other complaints about HHA Alpha were reported to Medicare through the duration of the UCO. During the course of the UCO, a total of 27 subjects were paid

---

[4] An anonymous complaint filed in 2016 alleged a durable medical equipment kickback scheme, which was closed due to insufficient information. In 2015, Medicare closed a patient allegation of false billing by HHA Alpha after a review of documents provided by HHA Alpha justified the billing.

[5] Only three patients out of 129 interviewed by FBI complained and the complaints consisted of (1) early discontinuation of treatment, (2) a nurse should have shown up more often, and (3) physical therapy should have been longer. Of all patients referred to HHA Alpha by targets of the investigation during the UCO, the FBI was unable to interview 31 patients due to the patients passing away in hospice care or because the patients could not be located – generally international patients. As to those patients, no complaints regarding patient care were ever filed against HHA Alpha.

kickbacks and referred patients to HHA Alpha. At no time during their meetings with CW-1 and/or UCE did the subjects express any concerns regarding the treatment of their patients by HHA Alpha nor notify that any patient complaints had been received. Further, none of the subjects indicated they were aware of any illicit conduct by HHA Alpha prior to or during the UCO.

### C. AGENT QUALIFICATIONS

11. I am a Special Agent of the FBI and have been so employed for approximately three years. I am currently assigned to the Complex Financial Crime Squad of FBI's San Francisco Field Division. As part of my assigned duties, I investigate possible violations of federal criminal law, specifically investigations involving white collar crime. I have received specialized training in health care fraud matters including, but not limited to, Anti-Kickback, Mail Fraud, Wire Fraud, and False Claims. I have participated in the execution of various arrests and search warrants in which business and personal documents, bank records, computers, and other evidence of fraud and other crimes have been seized.

12. In the course of this investigation and my investigation of other health care fraud schemes, I have (1) interviewed numerous persons; (2) reviewed numerous records and pertinent data; (3) read interviews and other reports written by other law enforcement officers; and (4) become familiar with the manner and means by which health care fraud schemes are operated including violations of 42 U.S.C. Section 1320a-7b and 18 U.S.C. Section 371.

13. This affidavit is intended to show merely that there is sufficient probable cause for the requested Complaint and arrest warrant and does not set forth all of my knowledge about this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only. Where excerpts of transcripts of audio recorded conversations are presented, they represent my best effort at this time to transcribe such recordings and I believe them to be accurate in substance.

### D. COMPLAINANT

14. Dr. Kerisimasi REYNOLDS is a 37 year old orthopedic surgeon with a practice in Fremont, California ("CA"). During the course of the investigation, REYNOLDS accepted kickback payments from an FBI UCE in exchange for patient referrals.

5

15. Dr. April MANCUSO is a 38 year old physician, practicing in the San Jose and Los Gatos, CA areas. During the course of the investigation, MANCUSO accepted a kickback payment from an FBI UCE in exchange for patient referrals.

### E. STATUTE VIOLATED

16. **Title 42, United States Code, Section 1320a-7b(b)(1)(A)**, in relevant part, makes it a crime for any person to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directory or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

## II. PROBABLE CAUSE

### A. REYNOLDS IS INTRODUCED TO UCE BY A CO-CONSPIRATOR

17. In January 2017, CW-1 identified GLENNDA SANTOS ("SANTOS") as a prominent marketer employed by several HHAs in the area.

18. CW-1 informed agents that SANTOS was participating in a cash-for-patient referral scheme involving physicians, hospital case managers, and employees at skilled nursing facilities throughout the San Francisco Bay Area. In so doing, SANTOS would give envelopes of cash to these individuals in order to direct patient referrals to the HHAs.

19. The UCO initially focused on SANTOS and individuals believed to be accepting kickbacks from her.

20. On or about August 30, 2017, SANTOS sent REYNOLDS' contact information to CW-1 and UCE via group text message. In the same text message exchange, SANTOS also provided the name of REYNOLDS' wife, MANCUSO. SANTOS offered to "connect" CW-1 and UCE to REYNOLDS. Below are screen shots of the aforementioned exchange:



21. As instructed by SANTOS, UCE placed a call to SANTOS to discuss an introduction to REYNOLDS. During their conversation, UCE offered to pay SANTOS for the introduction. Below are excerpts of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| UCE: | So question for you, um obviously, you know the work you are doing for us, we have something for you too, but I presume you don't want us to do that in front of [identified co-conspirator], right? | UCE if offering to pay SANTOS for the introduction to REYNOLDS. |
| SANTOS: | Oh, we will actually meet before she shows up. | |
| UCE: | Oh so we meet at five and she shows up after? Okay great. We'll take care of our business and then we'll meet with her. Excellent, I hope you feel better. | |
| SANTOS: | Yea, I know how to do my thing, don't worry. | |

22. Later during the same conversation, SANTOS confirmed she had already spoken to REYNOLDS about the kickback scheme. Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| UCE: | Does he know what we are asking him about? He's, he's… | |
| SANTOS: | Yes, he knows and he knows (unintelligible) me. | |
| UCE: | And he is on board with it? Perfect. | |
| SANTOS: | Yes, yes, it is already done. The deal is done you just have to go there and say, I know Glennda talked to you about, here we are. And this is it, you know? He knows already. You don't have to do any talking. I did it already. | |

7

### B. REYNOLDS AGREES TO THE KICKBACK SCHEME

22. On August 31, 2017, CW-1 and UCE recorded a meeting with REYNOLDS at his medical office in Campbell, CA. During the meeting, REYNOLDS and UCE discussed the kickback scheme, including kickback amounts and the need to be careful. Below are excerpts of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| UCE: | So the schedule we usually start out with is we would like to give you a thousand dollars. And we're looking for two patients a month. And the next month we can add up to two thousand and then finally three thousand. And we would like to keep it at that level, just we because we don't want someone to say too many people to one place. So we're not, in fact we actually encourage our doctors to not be exclusive to one place because I think that looks (UI). So does that sound like a fair structure to you? | UCE explains the referral scheme to REYNOLDS. |
| REYNOLDS: | Yeah, your incentive value, you don't want to demonstrate your incentive value. | |
| UCE: | Right, that's exactly it. The subtlety of it is that there are, I will admit that there are our counterparts who in my opinion are a little too brazen and they are demanding exclusivity. And they are demanding a lot. | UCE if referencing other HHAs who are less careful with their kickback arrangements, engaging in exclusive referral relationships with draw attention of law enforcement. |
| REYNOLDS: | That's happening in the surgery center world. I mean we are trying to get around the (UI) somewhere. You want to benefit for the surgeries that you are bringing into the centers, at the same time you've got to hide it a little more. | REYNOLDS expresses his understanding that benefitting from referrals needs to be hidden. |

23. During the meeting, UCE paid REYNOLDS $1,000 cash in exchange, REYNOLDS agreed to send two patient referrals to HHA Alpha. Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| UCE: | So, it should be unbroken thousand dollars and if you're ok starting that way…. | |
| REYNOLDS: | Yes. | |
| UCE: | Try if you can to send us two [patients]. Um, then in a month's time we'll reach out to you. | |

8

| REYNOLDS: | OK. | |

### D. REYNOLDS INTRODUCES UCE TO A CO-CONSPIRATOR

24. During their initial meeting on August 31, 2017, UCE asked REYNOLDS whether or not his wife, MANCUSO, would be interested in participating in the scheme. REYNOLDS offered to connect UCE with MANCUSO and other physicians in the area. UCE offered to pay REYNOLDS for the introductions. REYNOLDS understood the arrangement would be "mutually beneficial" to both he and UCE. Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| UCE: | Um, so, I don't mean to, Glennda suggested that your wife might also be interested. | Per her text message, SANTOS suggested REYNOLDS' wife MANCUSO might be interested in the patient referral scheme. |
| REYNOLDS: | Yeah, yeah she is pediatrics (UI) pain that sort of thing. I will connect you. What I can do is have her reach out to you, is that ok? | REYNOLDS acknowledged MANCUSO was interested in the patient referral scheme and offers to have her contact UCE. |
| UCE: | Have her reach out to me. We would like to have a nice face to face, but perfectly happy to have her on board | "On board" refers to MANCUSO's agreement to participate in the kickback scheme. |
| REYNOLDS: | There are some physicians in the area that I've become friendly with that I have to find a way to connect you with. | |
| UCE: | So and understand that we also show appreciation to everyone who have brought more to the program. So, we will stop by as well for that. Ok? | UCE explains to REYNOLDS, he/she will pay REYNOLDS for any additional doctors brought into the patient referral scheme. |
| REYNOLDS: | I think this can be mutually beneficial | REYNOLDS states this could be beneficial to both of them. |

22. On January 23, 2018, during a text message exchange with CW-1, REYNOLDS attached an authorization for a patient ("Patient 1")[6], REYNOLDS referred to HHA Alpha. REYNOLDS advised Patient 1 was "Approved for hhc [home health care]" and "a couple more in the pipeline", indicating REYNOLDS intended to refer more patients to HHA Alpha.

23. After sending the authorization for Patient 1, REYNOLDS sent CW-1 and UCE a text message requesting, "…if you can guide me on what you want authorized…I can be flexible".

---

[6] Throughout this affidavit, I have removed patients' names to protect their privacy, and have referred to them instead as "Patient 1," "Patient 2," etc

9

REYNOLDS' text message indicated he would be willing to authorize additional services if requested by CW-1. In doing so, HHA Alpha could benefit financially by billing for additional services that were not medically necessary.

24. After receiving the referral of Patient 1, UCE sent a text message to REYNOLDS offering to meet REYNOLDS to "thank you in person and perhaps discuss your wife's thoughts on our proposal?" REYNOLDS responded to UCE, "Yes – I will connect you with her. We were just talking. She's with [doctor] at Allied pain and has WC [workman's comp] pain pts [patients] needs hhc/PT [home health care/physical therapy]...will connect you."

25. REYNOLDS then sent CW-1 and UCE an introductory group text message including MANCUSO, stating "April - please meet Ravi and Shan... they will take care of all hhc needs. I will be sending all WC hhc patients their way". REYNOLDS text message indicated he was willing to send all patient referrals to HHA Alpha in exchange for kickback payments.

### E. MANCUSO ACCEPTS KICKBACKS IN EXCHANGE FOR PATIENT REFERRALS

26. On January 25, 2018, CW-1 and UCE recorded a meeting with MANCUSO at the Bay Club Courtside in Los Gatos, CA. During their meeting, MANCUSO confirmed she had spoken with REYNOLDS prior to the meeting. Below are excerpts of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| UCE: | So it's a pretty simple thing. So in the meantime what we're doing is, um, just developing trusted relationships with people. I think, has your husband, I assume has told you… | |
| MANCUSO: | Yeah. | |
| UCE: | Okay, so that's basically what we're doing. And then, um, October 1st, we get to really run the whole place as we want, but in the meantime we want to make sure, that we, we have the right base of people who are working with us. | |
| MANCUSO: | Mmhmm. | |
| UCE: | So if that's something that's along lines that you were thinking? Is that… | |
| MANCUSO: | Yeah, yeah. That's kind of what he explained to me. | |

27. During their conversation, MANCUSO advised she was currently treating patients with a mix of insurance providers. UCE explained their preference for Medicare patients as Medicare has a higher reimbursement rate when compared to other insurance providers. Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| MANCUSO: | But now I'm a pretty big mix. | MANCUSO is explaining she treats patients with a variety of insurance providers. |
| UCE: | Ok. Good. | |
| MANCUSO: | It's about yeah…it's about even actually. | |
| UCE: | Ok. So…it's as he said um you know there's certain things especially the uhh the Medicare pays the best but…we're you know… | |
| MANCUSO: | They do? Better than covered insurance? | |
| CW-1: | Yes…for home health. For hospitals for…offices it's different. | |
| UCE: | For home health and hospice it's actually the best. | |
| MANCUSO: | Oh, ok. | |

28. UCE later explained the payment structure and how MANCUSO could increase from $1,000 for two patient referrals to $3,000 for six to eight patients. Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| UCE: | So, I'll tell you a little bit about what we generally do. For one to two patients a month, we generally do a thousand dollars. | UCE explains for two patient referrals a month, MANCUSO would be paid $1,000. |
| MANCUSO: | Okay. | MANCUSO acknowledges. |
| UCE: | And, um, if you ever get to that level that where you feel like, we do $3000 a month for people who are gonna send us six to eight patients. | UCE explains for six to eight patient referrals a month, MANCUSO would be paid $3,000. |
| MANCUSO: | Okay. | MANCUSO acknowledges. |

29. At the end of the meeting, MANCUSO and UCE discuss the referral of Patient 1. MANCUSO confirmed REYNOLDS had referred the patient and accepted $1,000 from UCE for the referral of Patient 1. UCE clarified the $1,000 payment was for REYNOLDS and then offered

MANCUSO $1,000 cash to begin their kickback arrangement. Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| UCE: | And, um, so your husband actually just sent us something. | UCE told MAUSCO her husband (REYNOLDS) just sent HHA Alpha a patient. |
| CW-1: | Yes, he did. | MANCUSO acknowledges he did. |
| UCE: | So, um, we had, met him before and given him something, so we have something for him, and something for you. | |
| MANCUSO: | Okay. | |
| UCE: | Makes sense? | |
| MANCUSO: | Yeah. We don't get taught negotiation. You guys are like this is the easiest business ever to go in with doctors. [laughter] | |
| CW-1 | It's a lot easier for us [all laugh]. Especially his job. | |
| UCE: | So…that is $1000 and…let's make sure… that's also $1000. So that's for your husband as well. | UCE paid MANCUSO $1,000 to send HHA Alpha patients and $1,000 for REYNOLDS for the patient he sent. |

### III. PROBABLE CAUSE FOR THE VIOLATION

#### A. TITLE 42 UNITED STATES CODE, SECTION 1320A-7B(B)(1)(A), THE ANTI-KICK BACK STATUTE

30. Title 42 United States Code, Section 1320a-7b(b)(1)(A), in relevant part, makes it a crime to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any service for which payment may be made in whole or in part under a Federal health care program.

31. Based on all of the foregoing, probable cause exists to believe that REYNOLDS and MANCUSO accepted kickback payments from UCE that were intended to induce REYNOLDS and MANCUSO to send patient referrals to HHA Alpha for home health and/or hospice services later billed to Medicare.

32. Medicare is a federally funded health care program, and the referral of patients to HHA Alpha by REYNOLDS and MANCUSO for home health and/or hospice services constitutes a referral, as defined by Title 42 United States Code, Section 1320a-7b(b)(1)(A).

33. Therefore, there is probable cause to believe REYNOLDS and MANCUSO's agreement to send patient referrals to HHA Alpha in exchange for cash payments from UCE meets the definition of a kickback payment and violates anti-kickback statute.

## IV. CONCLUSION

34. Based on the foregoing, there is probable cause to believe REYNOLDS and MANCUSO conspired to receive kickbacks in exchange for patient referrals, in violation of 18 U.S.C. § 371 and 42 U.S.C. § 1320a-7b(b)(1)(A).

## V. REQUEST FOR SEALING

35. Since this investigation is ongoing, disclosure of the Complaint, this affidavit, and/or this application and the attachments thereto will jeopardize the progress of the investigation. Disclosure could result in the destruction of evidence, intimidation or collusion of witnesses, or the flight of a suspect. Accordingly, I respectfully request the Court issue an order directing this Affidavit and any related documents be sealed until the further order of this Court.

_____
Janette Spring, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me
this 3rd day of September, 2019.

_____
HON. JOSEPH C. SPERO
United States Chief Magistrate Judge